Filed 5/29/15  P. v. Bachmeier CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GEORGE LOUIS BACHMEIER,<br><br>    Defendant and Appellant. | H040650<br>(Santa Clara County<br>Super. Ct. No. 95953) |

Defendant George Louis Bachmeier appeals from an order extending his commitment under Penal Code section 1026.5[1] for two years.  He contends that the trial court erred by failing to instruct the jury that (1) it had to find he has serious difficulty controlling his "dangerous" behavior, and that (2) reasonable doubt means the lack of an "abiding conviction."  Defendant further argues that the cumulative effect of the errors requires reversal.

For reasons that we will explain, we will affirm the order for extended commitment.

---

[1] All further statutory references are to the Penal Code.

# BACKGROUND

## *Defendant's Prior Commitments*

In the early 1980's, criminal proceedings were instituted against defendant, charging him with assault with a deadly weapon with personal infliction of great bodily injury. (§§ 245, subd. (a)(1), 12022.7). He was admitted to Atascadero State Hospital (Atascadero) after being found incompetent to stand trial. Defendant was later found not guilty by reason of insanity (NGI) (see § 1026), and was thereafter readmitted to Atascadero. He was eventually placed under the supervision of a conditional release program (CONREP) at various points in time, most recently in 2012, but ultimately he was rehospitalized each time at Napa State Hospital (Napa).

Defendant's commitment term has been extended repeatedly. This court affirmed two of the extended commitment orders in unpublished decisions. (*People v. Bachmeier* (May 12, 2009, H033016) [nonpub. opn.]; *People v. Bachmeier* (Dec. 14, 2010, H035324) [nonpub. opn.].)[2]

## *The Recent Petition to Extend the Term of Commitment*

In June 2013, defendant's treatment team determined that, because of a mental disease, defect, or disorder, defendant represented a substantial danger of physical harm to others, and recommended that defendant's term of commitment, which was set to expire on February 11, 2014, be extended pursuant to section 1026.5, subdivision (b). The Acting Medical Director of Napa sent a letter to the District Attorney of Santa Clara County, requesting that a petition be filed for the extension of defendant's commitment. In July 2013, the district attorney filed a petition for a two-year extension of defendant's commitment.

---

[2] We take judicial notice of this court's opinions in defendant's previous appeals. Our background summary includes information that we have taken from our prior opinions.

*The Jury Trial*

A jury trial was held on the petition in January 2014.  The following two witnesses testified for the prosecution:  Douglas Johnson, Ph.D., who has been involved with CONREP, and Sandy Ann Folker, Ph.D., who has been defendant's treating psychologist at Napa.  Defendant testified in his own behalf.

**Douglas Johnson**

Dr. Johnson testified as an expert in the diagnosis and treatment of mental disorders and assessing risks of dangerousness.  Dr. Johnson has been the community program director for Harper Medical Group, which runs a CONREP for the state in Santa Clara County and certain other counties.  Dr. Johnson has known defendant since 1992, when Harper Medical Group took over the contract for CONREP, as defendant had already been part of CONREP.  Dr. Johnson testified as follows.

Defendant's diagnosis is paranoid schizophrenia.  Defendant, who was born in 1952, was symptom-free until he suffered an injury in an accident when he was about 20 years old.

Schizophrenia is a cognitive disorder, meaning it affects the way a person thinks.  The disturbances may be in the form of a person's thinking, such as disorganized thinking when one idea leads to another association that does not seem related, or in the content of a person's thinking, such as paranoia, delusions, and grandiosity.  Schizophrenia may also include a disturbance in perception, meaning hallucinations, where the person experiences voices or other stimulation that other people do not experience.  Schizophrenia can be treated but not cured.  Medication is used to alleviate the symptoms.

Defendant has shown paranoid delusions.  At times, defendant felt he was working with the secret service or the government.  Defendant currently has delusions that people in his hospital treatment team have an agenda to harm him.  For example, he believes that he has been ordered released, but that the staff is conspiring to keep him locked in the

hospital. During an interview about two weeks before trial, defendant told the CONREP evaluator that he was not answering questions and that the court "has already decided this and I'm out of the program." Defendant's speech and thoughts have been at times grossly disorganized, where it is hard to follow his train of thought. He has had hallucinations where he hears voices. The disturbances have persisted for years.

Schizophrenia is a progressive disease. Defendant has had "a number of decompensations where his mental status has deteriorated." When people suffer a "decompensation" and then are stabilized, "they seldom ever go back to their original baseline. They may go back to 95 percent functioning, but after a number of decompensations, their mental status is never where it was originally." Dr. Johnson testified that defendant was "not the same man that [he] knew 20 some years ago." In particular, defendant's "decompensations have become more severe," and he has become more irritable and frustrated with the system.

In assessing dangerousness, Dr. Johnson considers many factors, including the history of violence, the nature of the mental illness, and the active symptoms. The person's manageability as an outpatient is also considered, including whether the person is compliant with medication.

"Medication noncompliance is one of the major risks for decompensation." When people are properly treated with medication and their positive symptoms are ameliorated, they may no longer think they are mentally ill because they are functioning at a higher level and may believe the medication is no longer necessary. Consequently, it is important to have people continue their medication even though their positive symptoms are in remission.

Defendant has a criminal history of assaults. The history is important because "the best predictor of future behavior is past behavior," and "prior assaultive, violent behavior is a major risk factor."

The underlying crime, in which defendant was found not guilty by reason of insanity, occurred in 1983. Defendant had stopped taking his medication and went to his mother and stepfather's home, where he found that all of his belongings in his van had been taken away and destroyed. Defendant subsequently got into a dispute with his stepfather and stabbed him. Defendant felt he was unfairly treated and has described the incident as an argument that got out of hand.

Defendant has been verbally aggressive in the state hospital. Verbal aggression is the first step in most of the altercations at the hospital. Dr. Johnson attributes to a "large degree" defendant's "ability to remain assault-free" to the training and intervention of Napa staff. People at the hospital are closely watched. "The hospital can be a very difficult environment and there are many provocative individuals there, but there's also trained staff that . . . can intervene quickly and, most times, stop aggression from getting out of hand." At some point prior to 2012, defendant was violent enough that he had to be in seclusion and restraints.

Dr. Johnson views verbal altercations as a "high-risk" situation because verbal altercations can easily escalate. He explained that one of the benefits of CONREP "is we can intervene early. In fact, that's one of our missions . . . to make sure people who are in our program don't act out physically, so we have the authority to intervene quickly." In contrast, in the general community, there are not skilled, trained people to intervene so verbal threats can easily escalate.

One of the criteria for placement in CONREP is for the person to be able to recognize symptoms and take steps to control them if they increase in severity. Dr. Johnson testified that the person must be able to recognize a symptom and report it because "we have to ensure that that doesn't lead them to dangerousness."

Defendant has been accepted into CONREP four times and each time it has resulted in rehospitalization.

5

Defendant's first period in CONREP was from 1990 to 1996. He was rehospitalized after his mental status appeared to deteriorate, his symptoms got worse, and a concern arose regarding medication noncompliance after he was found with more medication than he should have had in his possession.

Defendant's second placement in CONREP was from 1997 to 2003. During this period, stressors occurred and defendant started talking about an old girlfriend. He parked his car outside a house and stayed there for some period of time. A police officer reported to CONREP that defendant was harassing the person. Defendant claimed that he knew the person, but the person denied having a prior relationship with defendant. Defendant's conduct was considered serious because he wanted to confront someone in the community without having discussed it in treatment, and there was a concern he could have become violent if there was a confrontation.

Defendant's third time in CONREP was for approximately eight months in 2004. Defendant was having paranoid thoughts that he failed to discuss in treatment. A roommate had reported that defendant was talking about the Secret Service and a political conspiracy. Defendant eventually acknowledged the thoughts when confronted. Dr. Johnson explained that "we want to know early on" when people show interest in this theme "so we can be involved in directing their thinking and their behavior." "When they don't see that high-risk situation with these themes and start to act independently, . . . it's a matter of time before they get to a point of non-return, meaning we're not able to redirect them."

Defendant was last placed in CONREP from April to June 2012. Within a short period of time, defendant's behavior became more bizarre. A peer who was living with defendant complained to staff that defendant "tried to blow cigarette smoke up a cat's butt and asked the peer if he knew how to make a cat." Defendant also had compliance issues, such as missing group therapy sessions and medication calls. Prescription medication was also found in his pocket, and it was unknown whether the medication

6

belonged to him or a peer. Medication noncompliance raises a risk of decompensation, and missing group therapy is a warning sign that a person may be less serious about overall recovery and placement in the community. Defendant's paranoia also returned, and he felt there was a mafia conspiracy. There was also a concern that he was experiencing hallucinations when he felt there were electrical signals and tried to answer a telephone that was not ringing. Regarding the decision to rehospitalize defendant, Dr. Johnson testified that defendant seemed to be more symptomatic "and it was just a case of looking at the history and where things go when he starts to decompensate. We needed to make sure we intervene sooner rather than later."

Dr. Johnson does not believe that it is appropriate for defendant to return to CONREP in his current state. Defendant is "psychiatrically unstable," delusional, paranoid, irritable, and not cooperative with treatment.

Dr. Johnson believes that the paranoid schizophrenia is causing defendant serious difficulty in controlling his behavior because "[t]here are a series of interactions with staff where he's become verbally aggressive and threatening." Dr. Johnson explained that when people have paranoid beliefs, those are real experiences to them. When they feel that others are out to harm them rather than help them, they become frustrated or frightened and act out in an aggressive manner.

Defendant's violence appears to be driven by his paranoia, which makes him dangerous. As part of his paranoia, he sees people who may want to be helpful as working against this best interest. Defendant has directed his anger, hostility, and threats toward staff members. At times, he believed the staff was involved in a conspiracy to keep him at the hospital against the judge's orders. This is similar to some of the paranoia he exhibited in 1983 when he stabbed his stepfather. He also got angry at his psychiatrist who offered to change his medications to get better control of his symptoms. The fact that defendant tends to direct his threats to the people who are trying to help him is not a good predictive factor for him seeking out treatment in the community.

7

Dr. Johnson believes that defendant would represent a substantial danger of physical harm in the community, and that the danger of physical harm would increase without supervision by CONREP to monitor warning signs, such as medication compliance. Dr. Johnson does not believe that defendant would continue to take medication or seek treatment if he was released in the community because he does not see himself as mentally ill.

In order for Dr. Johnson to recommend defendant for CONREP, defendant's mental status needs to be stabilized, and he needs to gain acceptance of his mental illness and the need for ongoing treatment, and he needs to commit to attend and participate in treatment.

### Sandy Ann Folker

Dr. Folker is a clinical psychologist who has been working at Napa since 2011. She testified as an expert in the diagnosis and treatment of mental disorders and assessing risk of dangerousness. Dr. Folker testified as follows.

Dr. Folker has been defendant's treating psychologist in the stabilization unit at Napa since defendant returned to the hospital in 2012. The stabilization unit is for patients whose behavior is "still aggressive, floridly psychotic." The unit has the highest level of security and "every door is behind lock and key."

To move from the stabilization unit to the transition unit, a person must not exhibit overtly aggressive behavior or criminal activity for six months. Overtly aggressive behavior includes threatening other people and getting into physical altercations. The person must also engage in about half their groups, be medication compliant, and show some motivation to want to get out of the hospital. If the person is successful in the transition unit, the person may be transferred to the discharge unit where the goal is to work with the CONREP provider and others in order to be released back into the community.

8

In assessing violence risk, Dr. Folker considers a variety of factors. A person's history of violence is the strongest predictor. "The more people have done it in the past, the more likely they're [going] to do it in the future." Dr. Folker also looks at whether the symptoms that triggered past aggression are currently present; whether the person has a realistic plan for the future; and whether the person is willing to engage in treatment, stay on his or her medication, and stay in contact with the mental health professional in case the person starts to decompensate, meaning become more psychiatrically ill.

Defendant was born in 1952. He first psychotic break occurred around the age of 20. Thereafter, he had 14 short hospitalizations, meaning 72-hour holds for someone who is a danger to himself or others, as well a longer period of treatment at another facility.

Most of defendant's criminal history occurred after his first psychotic break. Defendant's prior offenses include disturbing the peace, assault, and battery. He has also had repeated altercations with his family and made verbal threats or engaged in physical violence. The incidents most commonly occurred after defendant was released from hospital care and he stopped taking his psychiatric medication or was no longer compliant with treatment.

Defendant's underlying crime, for which he was found not guilty by reason of insanity, occurred after he had been released from jail for threatening his mother and stepfather. Defendant stopped taking his medication a few days before the underlying crime and did not check in for his treatment. He violated a restraining order by returning to the home. He found that his van, which contained his belongings, had been towed away. Defendant got into an altercation and stabbed his stepfather in the eye, causing vision loss. His mother also sustained injuries.

Defendant's history reflects that his illness has progressed in severity over time. When a person repeatedly goes on and off medications, the brain usually becomes less receptive to the medication the next time. Consequently, when a person finds a

9

medication that works, remaining medication compliant is the best predictor of being able to be rehabilitated, staying in the community without aggression, and being able to live a normal life. Defendant, on the other hand, repeatedly went off medication. Each time he was rehospitalized, he has not been as responsive to the medication and has not returned to the same baseline. Over time defendant has gotten progressively more ill.

The symptoms of schizophrenia that Dr. Folker has observed in defendant include talking in response to voices, conversations, or things that are not there, and delusions about conspiracies against him and about being a member of the mafia. Dr. Folker has also observed defendant when he becomes more symptomatic and his behavior gets very disorganized. During those periods, defendant was unable to maintain day-to-day activities, he urinated in random places in the unit, and he was not able to form a clear sentence.

Defendant's paranoid schizophrenia affects his ability to properly perceive or process reality. For example, when Dr. Folker talked to defendant prior to trial, defendant told her that there was already a release from the judge for him to be in the community, that his attorney had been arrested, and that Dr. Folker was part of the conspiracy.

Defendant also exhibits a lack of insight, meaning that when his symptoms emerge, he is unaware of them, is very defensive and adamant that he is not experiencing anything, and becomes very irritable and angry when confronted.

The lack of insight is a factor for risk of violence. More than 50 percent of the people with schizophrenia have a neurological symptom in which they are unaware that they are experiencing a symptom of schizophrenia and unaware of what is happening. When the person becomes symptomatic and is experiencing, for example, a paranoid delusion that someone is after the person, regardless of what information is provided the person is insistent, fearful, and trying to defend his or her life against a threat that is not actually there. It can make the person imminently dangerous, and the person tends to

10

also refuse medication or treatment due to a belief that he or she is not ill and that nothing is happening.

In August 2012, defendant met with Dr. Folker and other treatment team members and appeared increasingly more psychotic. He insisted that he "had multiple degrees in education, in psychology, and the ideology of all the human beings." He was defensive, angry, and had a hostile tone. He could not be redirected and was unaware of the sudden shift in his symptoms. The incident reflected defendant's cycle over the years of having more symptoms, being unaware of the sudden shift, and becoming very irritable and hostile. The next day, defendant was yelling in the dining hall and referring to the team's conspiracy against him. His speech was aggressive in tone, and he was nonresponsive to the staff's attempts to redirect him.

In October 2012, defendant used a hostile and threatening tone with a staff member regarding use of a vending machine.

In early December 2012, defendant met with his treating psychiatrist. Defendant told her that she was his daughter, and he threatened that she would not make it home if she raised his medication. One week later, defendant became so aggressive that the hospital police had to be called, and he was given emergency medication to calm down.

In May 2013, defendant threatened his treating psychiatrist with a physical confrontation if she changed his medication.

When defendant's medication changed within a year prior to trial, he threatened not to take the medication. As a result, his medications are crushed to powder because it is more difficult to spit out than a pill.

Defendant has not been physically violent since his underlying crime in 1983. Dr. Folker believed that defendant's verbal threats have not escalated to physical aggression due to the intervention of hospital staff. In the hospital setting, the idea is to "interact early, and therapeutically intervene" when someone is getting extremely disorganized or becoming highly irritable. If defendant was in the community, Dr. Folker

11

believed defendant's threats would likely escalate to physical violence for the same reason he was rehospitalized the last time. Dr. Folker described the history of defendant's mental illness as having "cycled." He disengages in treatment, stops taking his medication, and then begins having symptoms. He experiences a lack of insight, is very insistent and demanding that he is not ill, and becomes increasingly more ill and increasingly more dangerous, threatening, and irritable. Each time he was placed in CONREP, he had to be rehospitalized.

When defendant first arrived in Dr. Folker's unit in mid-2012, he was much better than he is now. He was aware that he had a mental illness, could explain his history and symptoms, and attended group therapy. Within one or two months, defendant started to have beliefs that his treatment team, including Dr. Folker, was part of a conspiracy against him and that he was part of the mafia. His symptoms have further progressed and within the last six months before trial, defendant has refused to engage in treatment altogether.

In preparing someone for release into the community it is important that the person understands his or her symptoms, is able to recognize the symptoms, and is willing to let someone else, such as a friend or mental health professional, know about the symptoms. It shows the person has insight and the ability to help themselves. Dr. Folker recently tried to have such conversations with defendant but he informed her that it is not any of her business, and he refuses to meet with the treatment team.

In Dr. Folker's opinion, defendant's paranoid schizophrenia causes him serious difficulty in controlling his behavior at this time. Defendant is showing symptoms of the illness and is completely disengaged in treatment. If he is confronted about medications, treatment, or being mentally ill, he becomes irritable, hostile, and can be threatening. At this time, defendant does not believe he is ill and does not believe he needs treatment. It would be "extremely dangerous" if he was in a less secure setting because "he likely wouldn't take his medications and wouldn't follow through with treatment." If defendant

12

stopped taking his medication, Dr. Folker would expect him to become extremely delusional and disorganized, his paranoid beliefs would become more severe, and he would become more aggressive. Dr. Folker would also expect him to become physically violent if he was off medication and unsupervised. Dr. Folker believes that defendant would represent a substantial danger of physical harm to others if he was free in the community, and that he would have serious difficulty controlling that dangerous behavior if he was free in the community.

### Defendant

Defendant testified that when he was about 20 years old, he was involved in an automobile accident and thereafter had symptoms of a mental illness. He was hospitalized on 72-hour holds between 8 and 11 times and was diagnosed with a mental illness. He believes he was sent to the hospital once because his roommate "set [him] up."

Defendant was ordered to take psychiatric medication but the medication in those days had bad side effects. He could have gone to a hospital to get something to alleviate the side effects. Defendant did not take his medication at times because he thought he needed another type of medication.

Prior to the underlying offense, defendant had gone to jail for assault. Defendant testified that he had pushed his mother over a coffee table because she "came at [him]" and it was his "first reaction."

Defendant testified that when he got out of jail, his mother told him there was a restraining order against him. He left the property but returned a few days later "cold, wet, hungry, despondent," and seeking money from his mother, who was his conservator. Defendant found that his van had been towed away, and that all his property was taken away and disposed of somewhere else. Defendant testified that his stepfather came at him, so defendant picked up a kitchen knife and wrestled him to the ground. His stepfather "was fighting back," and defendant hit him in the forehead and "accidentally

13

grazed his eye." Defendant testified that he was in a rage at the time and that he has since felt remorseful.

Defendant believes that he and his stepfather were both mentally ill at the time. Defendant also believes that if he had not been taking prescribed medication, he would not have acted the same way during the incident. Defendant testified that he has not had any incidents of violence since the incident.

Defendant believes he has paranoid schizophrenia. He has "experienced various stages of what the doctors have said." When asked what he thought about being diagnosed with paranoid schizophrenia, defendant testified, "I believe I'm a reclusive individual."

Regarding whether he would continue to seek psychiatric treatment if released from his commitment, defendant testified, "I would see a doctor at this point and get on a medication where the doctor would be at least sincere and sympathetic to my needs, I hope, and give me enough medication to take care of the side effects that I get from medication . . . ." Without something to combat the side effects, the medication was "physically debilitating, and very, very aggravating to contend with."

Regarding incidents at the hospital involving his verbal aggression, defendant testified that it is sometimes frustrating at Napa. The other people living there have various psychiatric illnesses and are "very unremorseful, contentious." He testified that he has not aggressively attacked anyone and that he would not aggressively attack anyone. He has been attacked and has had to defend himself. If he was released from his commitment he would try to live a peaceful life. Defendant does not consider himself a substantial danger of harm to anyone.

When asked why he does not attend group therapy sessions at Napa, defendant testified: "You do the program, you go through school, you get your diploma, you don't want to be tested further. There's no point in it. Taking away your material, not allowing you to have the things you've had in order to study, and then applying no materials

14

towards the situation, leaving you in the most restrictive secure unit in the hospital, most available unit to the police, and the police do intervene, but the staff are very aggressive also there. There's no police intervention at all. The police come and take the report later. It's all the . . . staff and the patients."

Defendant testified that he has heard voices that other people cannot hear. It most recently occurred one hour prior to him testifying at trial. Defendant refused to disclose at trial what he had heard because he did not want to "compromis[e]" anyone who may have been talking to him.

Regarding why he was rehospitalized after being placed in CONREP on various occasions, defendant testified about medication changes or other reasons. He did not believe that he was having symptoms of mental illness or that the symptoms were getting worse prior to some of the rehospitalizations. Regarding rehospitalization in 2004 after having "trouble" with his roommate "for describing certain governmental factors" to the roommate, defendant testified that he was not decompensating but rather "trying to come out of [his] shell, per se." Regarding his most recent rehospitalization, he "could have been" experiencing some symptom of his mental illness, as he "may have" picked up the phone with the belief that someone was going to call. He acknowledged being late for medications and group sessions. He denied telling anyone that he was a part of the New York mafia.

Regarding his statement to his psychiatrist in December 2012, that she was not going to make it home after they had talked about changing his medication, defendant testified: "She was obviously being abusive and cruel to me by using the medication that wouldn't apply to me to begin with, one that would have given me something like diabetes in no time flat. . . ." Defendant also testified that everyone has angels and that "[s]he may have been arrested for doing things to me that she shouldn't have. She wouldn't have made it home that night." He also referred to a television that is never on, phone calls being "bugged all the time," and the psychiatrist acting inappropriately as a

15

doctor. Regarding his subsequent threat to the psychiatrist in May 2013 about a confrontation, defendant testified that he meant there could have been further "verbal" confrontation.

Defendant testified that he received "psychic verbalization" from the hospital's executive director that she had an order from the state Supreme Court that he be released as of March 8, 2012. Defendant also testified that the judge presiding over the trial had "psychically" talked to him and had ordered him released. When asked whether he thought the hospital was ignoring these orders from the judge and from the Supreme Court and conspiring to keep him in the hospital, defendant testified: "Anybody could feel that way because the hospital staff ignored supposed phone calls that were possibly made or supposed to have been made to uphold my release . . . ."

When asked what he needed to do to control his schizophrenia, defendant testified "[p]ossibly confront or talk to a doctor about medication." Defendant testified that if he could take the psychiatric medicine of his choice, he would take the medication. He got angry in the past when the doctor wanted to change his medication because it was "obviously" the medication that he did not need. Defendant testified that the doctor was not respecting his opinion and his right, and he made reference to the fact that she was from Germany. When defendant was asked what happens when he does not take his medication, he testified, "Nothing I know of."

Defendant indicated that if he was released from his commitment, he would get his medication from Valley Medical Center. He testified, "A doctor there . . . has in the past wanted to see me about getting a license also to possibly smoke marijuana too, . . . if I fit the requirement that he specifies." Defendant testified that he has attended treatment groups that talk about the effect of drugs and alcohol on mental illness symptoms, and that he has been "[i]gnorantly" told that using marijuana can make his symptoms worse.

Defendant testified that he did not believe a person can stop taking psychiatric medication but a person also needs a separate medication to control the side effects.

16

Defendant testified that if he was taking the medication of his choice while he was free in the community, and a doctor told him that the medication needed to be changed, he would only take the medication that "agrees" with him along with a separate medication to control side effects.

Defendant testified that he would not be interested in group therapy if he was in the community. He is a "self-taught individual" and would rather "study" and "get reference from the books [he] read[s]." Defendant testified that he "could" go to an individual therapist, but he has "never had a positive event with a psychiatrist before." He indicated that he is not willing to start group therapy at Napa or to work to try to get out on CONREP again.

The trial court took judicial notice that there is no order in the court file from the Supreme Court ordering defendant's release, and that the only order from the trial court was for defendant's release into CONREP in 2012.

### The Jury's Finding and the Commitment Order

On January 29, 2014, the jury found true the petition alleging that defendant has a mental disease, defect, or disorder that causes him to have serious difficulty controlling his behavior which results in him representing a substantial danger of physical harm to others within the meaning of section 1026.5, subdivision (b). That same day, the trial court filed an order extending defendant's term of commitment for two years, until February 11, 2016.

### DISCUSSION

### Jury Instruction Regarding Serious Difficulty Controlling Behavior

The trial court instructed the jury pursuant to CALJIC No. 4.17. Relevant here, the court instructed the jury that, in order to prove the allegation that defendant represents a substantial danger of physical harm to others by reason of a mental disease, defect, or disorder, the People had to prove the following: "1. [Defendant] has a mental disease, defect or disorder; and [¶] 2. This mental condition causes [defendant] to have *serious*

17

*difficulty controlling his behavior*; and  [¶]  3.  As a result, [defendant] represents a substantial danger of physical harm to others."  (Italics added.)

On appeal, defendant contends that the trial court prejudicially erred by failing to instruct the jury that it must find he had a serious difficulty controlling his *dangerous* behavior.  (See CALCRIM No. 3453.**³**)  According to defendant, because he "had not committed any violent action in over 30 years, it is quite possible that a properly instructed jury might have determined that, while [he] had a serious difficulty controlling some aspects of his behavior, he did not have a serious difficulty controlling his dangerous behavior."

The Attorney General contends that the instruction was proper because, when read as a whole, it "adequately conveyed that the uncontrolled behavior must be *dangerous*." The Attorney General further contends that any error was harmless beyond a reasonable doubt.

" 'In assessing a claim of instructional error, "we must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " [Citation.]' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1025.)

"Under section 1026.5, subdivision (b)(1), a person found NGI is subject to extended commitments, beyond the maximum period of penal confinement, if 'by reason of a mental disease, defect, or disorder [the person] represents a substantial danger of physical harm to others.'  In addition, there must be proof that a person subject to

---

**³** CALCRIM No. 3453 provides that the People must prove the following about the defendant:  "1. (He/She) suffers from a mental disease, defect, or disorder;  [¶]  AND  [¶]  2. As a result of (his/her) mental disease, defect, or disorder, (he/she) now:  [¶] a. Poses a substantial danger of physical harm to others;  [¶]  AND  [¶]  b. Has serious difficulty in controlling (his/her) *dangerous* behavior."  (Italics added.)

18

commitment has 'serious difficulty in controlling . . . dangerous behavior.' [Citations.]" (*People v. Bowers* (2009) 169 Cal.App.4th 1442, 1450.)

This latter requirement regarding serious difficulty controlling dangerous behavior "follows from the fundamental principle that ' "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." ' [Citations.] The requirement of serious difficulty in controlling dangerous behavior 'serves "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." [Citation.] . . . [A] prediction of future dangerousness, coupled with evidence of lack of volitional control, adequately distinguishes between persons who are subject to civil commitment and " 'other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' " [Citations.]' [Citation.]" (*People v. Sudar* (2007) 158 Cal.App.4th 655, 662-663, italics omitted (*Sudar*).)

In this case, the jury was instructed that the People had to prove: "1. [Defendant] has a mental disease, defect or disorder; and [¶] 2. This mental condition causes [defendant] to have serious difficulty controlling his behavior; and [¶] 3. As a result, [defendant] represents a substantial danger of physical harm to others." Although the second element did not expressly state that defendant's serious difficulty in controlling behavior had to pertain to dangerous behavior, we believe the jury necessarily would have had to make that finding in view of the third element. Under the third element, defendant could only "represent[] a substantial danger of physical harm to others" "[a]s a result" of a serious difficulty controlling his behavior if the uncontrolled behavior at issue was *dangerous* behavior. Thus, when the instruction is read as a whole, it adequately conveys the concept that the jury has to find that defendant has a serious difficulty controlling his dangerous behavior. Accordingly, we are not persuaded by defendant's contention that the instruction misinformed the jury.

19

Even assuming the instruction erroneously failed to require a finding by the jury that defendant had serious difficulty controlling dangerous behavior, we determine that the error is harmless. In *Sudar*, the trial court, in a proceeding to extend the defendant's commitment under section 1026.5, refused to instruct the jury that the prosecution had to prove that the defendant could not control his dangerous behavior. (*Sudar*, *supra*, 158 Cal.App.4th at p. 661.) As a result, the jury was instructed only that it had to find that the defendant suffered from a mental disease, defect, or disorder, and that as a result the defendant posed a substantial danger of physical harm to others. (*Id.* at p. 663.) The appellate court concluded that the error in failing to give the control instruction was harmless beyond a reasonable doubt because " ' "no rational jury could have failed to find [defendant] harbored a mental disorder that made it seriously difficult for him to control his violent . . . impulses." ' " (*Id.* at p. 664.)

In this case, the evidence reflected the following. Defendant has been diagnosed with paranoid schizophrenia. Schizophrenia is a progressive disease that affects the way a person thinks and it may include disturbances in perception. Defendant has delusions that people on his hospital treatment team have an agenda to harm him and are part of a conspiracy against him. He also has auditory hallucinations that appear to support this theory.

Defendant cannot control his delusions or hallucinations. Indeed, at times he has been unable to even recognize some of his symptoms. Although there are disturbances in defendant's thinking and perception, he believes the experiences are real and acts in accordance with them. For example, defendant has threatened his treating psychiatrist over medication changes, has engaged in verbal altercations with hospital staff, and has otherwise been aggressive and hostile toward those who are trying to treat him.

Medication controls some symptoms. However, defendant's cycles through CONREP, which provides a less restrictive environment than the stabilization unit or even the hospital in general, reflect that defendant disengages in treatment, stops taking

20

his medication, and begins having symptoms. He experiences a lack of insight, is insistent that he is not ill, and becomes increasingly more ill and increasingly more dangerous, threatening, and irritable. Defendant's four placements in CONREP each resulted in rehospitalization.

Defendant testified that he still hears voices that others cannot hear. He also indicated in his testimony that he believes the hospital staff is working against him, that he will only take the medicine that he chooses, and that he does not believe that anything happens if he does not take his medicine.

The evidence clearly established that defendant has a mental disease, defect, or disorder, that causes defendant serious difficulty controlling his dangerous behavior, that is, aggressive behavior toward others. Defendant does not realize he is experiencing disturbances in thinking and perception, and he acts in accordance with his beliefs, which currently involve a belief that others are not trying to help him, but rather are trying to do him harm. In acting aggressively based upon his beliefs, defendant poses a substantial danger of physical harm to others. In view of the evidence regarding the nature of defendant's mental illness, along with the evidence of his actions in CONREP and most recently in a restricted hospital setting, we believe that any error in failing to give an instruction concerning controlling "dangerous" behavior was harmless beyond a reasonable doubt because " ' "no rational jury could have failed to find [defendant] harbored a mental disorder that made it seriously difficult for him to control" ' " his dangerous impulses. (*Sudar*, *supra*, 158 Cal.App.4th at p. 664.)

### *Jury Instruction Defining Reasonable Doubt*

Prior to opening statements by the parties, the trial court instructed the jury regarding reasonable doubt as follows: "Reasonable doubt is defined as follows: [¶] It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that

they cannot say they feel an abiding conviction of the truth of the charge."  (See CALJIC No. 2.90)

After the close of evidence and prior to deliberations, the court instructed the jury that the People had the burden of proving beyond a reasonable doubt the requisite matters in the case.  The court instructed the jury with the following definition of reasonable doubt pursuant to CALJIC No. 4.17:  "Reasonable doubt in these proceedings is defined as follows:  It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that the requirements for extended detention have not been proven."

On appeal, defendant contends that the trial court erred by giving CALJIC No. 4.17 because the instruction, in defining reasonable doubt, did not refer to an "abiding conviction."  (See CALJIC No. 2.90; CALCRIM No. 220.)  According to defendant, the instruction "failed to impress the jury with the necessary level of certitude required to make the finding in this case."  Defendant contends the instruction was therefore deficient under the federal constitution, citing *Victor v. Nebraska* (1994) 511 U.S. 1 (*Victor*).  He argues that the error was structural and mandates reversal.

The Attorney General contends that the jury was properly instructed in this case because no particular language is required when instructing on reasonable doubt, the instruction in this case actually placed a higher burden on the prosecution, and the trial court had earlier instructed the jury on reasonable doubt by using the "abiding conviction" language.  The Attorney General also argues that even if there was instructional error, the error was not structural and was harmless whether assessed under the standard for federal constitutional violations or the standard for state law error.

"Courts of Appeal have held commitment extension trials under section 1026.5 to be essentially civil in nature, rather than criminal, because they are directed at confinement for treatment rather than punishment.  [Citation.]"  (*Hudec v. Superior Court*

22

(2015) 60 Cal.4th 815, 819 (*Hudec*).) Section 1026.5, subdivision (b)(7) provides that "[t]he person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." Pursuant to this provision, the People in a commitment extension trial have the burden of proving the requisite elements of section 1026.5, subdivision (b) beyond a reasonable doubt. (*Hudec*, *supra*, at p. 828; see *People v. Dobson* (2008) 161 Cal.App.4th 1422, 1434-1435.)

The California Supreme Court has explained that, "[u]nder the due process clauses of the Fifth and Fourteenth Amendments, the prosecution must prove a defendant's guilt of a criminal offense beyond a reasonable doubt, and a trial court must so inform the jury. [Citations.]" (*People v. Aranda* (2012) 55 Cal.4th 342, 356 (*Aranda*).) However, "[t]he failure to define the term 'reasonable doubt' does not amount to federal constitutional error. As the high court explained in *Victor*, 'the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.' (*Victor, supra*, 511 U.S. at p. 5.)" (*Aranda*, *supra*, 55 Cal.4th at p. 374.) In fact, " 'so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the [federal] Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.' " (*Aranda*, *supra*, at p. 358, quoting *Victor*, *supra*, at p. 5.)

In *Aranda*, the California Supreme Court addressed a trial court's failure to include the standard reasonable doubt instruction in its predeliberation instructions in a criminal murder case. The standard reasonable doubt instruction defines reasonable doubt with reference to an "abiding conviction." (See CALJIC No. 2.90; CALCRIM No. 220.) Although the trial court failed to use the standard reasonable doubt instruction, the trial court did "refer[] to the reasonable doubt standard . . . in its detailed instructions regarding the jury's obligation with respect to the elements of murder and to the elements of all of its lesser included offenses, including voluntary manslaughter." (*Aranda*, *supra*, 55 Cal.4th at p. 359; see *id*. at p. 351.) The California Supreme Court determined that

23

those instructions "clearly and directly connect[ed] the requisite standard of proof to those offenses." (*Id.* at p. 361; *see id.* at p. 363 [reasonable doubt principle must be "specifically linked" to the elements of the charged offense].) Although those instructions given by the trial court did not provide a definition of reasonable doubt (*id.* at p. 374), the California Supreme Court concluded that the omission of the standard reasonable doubt instruction did not amount to federal constitutional error with regard to the defendant's voluntary manslaughter conviction. (*Aranda*, *supra*, at pp. 358, 361, 374.)

In this case, the trial court instructed the jury that the prosecution had "the burden of proving beyond a reasonable doubt" the requisite elements of section 1026.5, subdivision (b). In view of this instruction, which "clearly and directly connect[ed] the requisite standard of proof" to findings that the jury needed to make (*Aranda*, *supra*, 55 Cal.4th at p. 361; see *id.* at p. 363), the omission of the abiding conviction language from the definition of reasonable doubt in the jury instruction did not amount to federal constitutional error in this case. (*Id.* at pp. 358, 361, 374.)

In reply, defendant contends that the prosecution's burden of proof "was, effectively, lowered" by the definition of reasonable doubt provided by the court to the jury. Defendant's argument is based on the contention that, in the absence of the abiding conviction language, the definition of reasonable doubt given by the court gave the jury "no . . . standard" with respect to the level of proof required.

We are not persuaded by defendant's argument. "The failure to define the term 'reasonable doubt' does not amount to federal constitutional error." (*Aranda*, *supra*, 55 Cal.4th at p. 374.) " '[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the [federal] Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.' " (*Id.* at p. 358.) Accordingly, in this case, the trial court's use of CALJIC No. 4.17, which defines reasonable doubt without

reference to an "abiding conviction," does not amount to federal constitutional error. (See *Aranda*, *supra*, at pp. 358, 361, 374.)

### *Cumulative Error*

Defendant contends that reversal is required under the "cumulative error standard." The California Supreme Court has stated that "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) In this case, we have rejected defendant's two claims of error with respect to CALJIC No. 4.17. We have further determined that, even if the instruction was erroneous in its failure to expressly state that the jury must find that defendant had a serious difficulty controlling his *dangerous* behavior, the error was harmless. In the absence of more than one error, defendant concedes that there is no cumulative error.

## DISPOSITION

The order for extended commitment filed January 29, 2014, is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P. J.

WE CONCUR:

_____
MIHARA, J.

_____
MÁRQUEZ, J.

**_People v. Bachmeier_**
**H040650**